**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| Hannah E. Jones, | Court File No. _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| ARC Automotive, Inc.; Hyundai Motor Group; Hyundai Motor Company; Hyundai Motor America; Kia Corporation; Kia America,Inc.; Hyundai Mobis Co., Ltd.; and Mobis Parts America, | **Jury Trial Demanded** |
| Defendants | |

## I.     INTRODUCTION

1.      If they operate correctly, airbags can save lives and prevent or limit head injuries in vehicle crashes. Nevertheless, when designed improperly, the inflator device that sets off an airbag can essentially explode at the wrong time, sending shrapnel into the head and throat of the driver or passenger, injuring or killing them.

2.      Defendant ARC Automotive, Inc. ("ARC") manufactures toroidal stored gas hybrid airbag inflators that are installed in tens of millions of airbag assembly modules used in vehicles manufactured and sold in the United States.

3.      At this early stage, Plaintiff cannot determine with certainty every vehicle manufacturer by make, model, and model year equipped with a defective ARC toroidal stored gas hybrid inflator. This action concerns vehicles with either a driver or passenger

toroidal stored gas hybrid inflator manufactured by ARC from 2001 to the present that use ammonium nitrate in its propellant or are prone to metal flash problems in the inflator mechanism ("Class Vehicles").

4.      All ARC Inflators at issue are substantially similar and share a common, uniform defect: the use of ammonium nitrate, a volatile and unstable chemical, as the propellant, combined with other faulty design decisions that compound the dangers posed by the volatility of the phase-stabilized ammonium nitrate ("PSAN"), including the failure to incorporate pressure valve relief valves and using friction welding to secure the inflator halves without ensuring all metal flash would be removed (the "Inflator Defect"). It is well known in the airbag industry—and ARC itself has acknowledged—that ammonium nitrate is a dangerous propellant chemical that can over-pressurize during airbag deployment, sometimes resulting in violent explosions of the metal inflator canister, which expels shrapnel into the passenger compartment. The Inflator Defect is present in ARC's toroidal stored gas hybrid inflators (the "Defective Inflators").

5.      ARC's stored gas hybrid inflators have ruptured in vehicles at least seven times, including one passenger inflator and six driver inflators. Two ruptures killed drivers. At least two more passenger inflators have ruptured during ARC's internal testing.

6.      Kia America, Inc., and Hyundai Motor America, Inc are aware of these hazards because of their similar experiences with the defective Takata airbags. Further, Hyundai is aware of issues with inaccurate airbag initiation from its recall of Sonata vehicles related to airbag control units. However, these Defendants have not recalled all of their vehicles containing the Defective Inflators.

7.     The National Highway Traffic Safety Administration ("NHTSA") is currently investigating ARC's toroidal stored gas hybrid inflators. ARC is aware that its Defective Inflators are installed in millions of vehicles. However, ARC has concealed from the public the defect that its inflators' propellent is made from volatile and unstable ammonium nitrate. ARC has not recalled any of the Defective Inflators. Airbag module manufacturers are also aware that ARC's inflators contain a propellant made from the unstable ammonium nitrate compound but have concealed the Inflator Defect from the public.

8.     When Plaintiff and the Class purchased or leased their vehicles, they were unaware the vehicles contained the Defective Inflators.[1] As a result of Defendants' misconduct and fraudulent concealment, Plaintiff and the Class purchased or leased vehicles they otherwise would not have acquired, or overpaid to buy or lease their vehicles than they would have paid, had they been advised of the Inflator Defect at the time of their purchase or lease. Plaintiff and the Class have sustained economic loss because the Defective Inflators substantially reduce the value of the vehicles in which they were installed. Plaintiff and the Class did not receive the benefit of their bargain, since they purchased and leased vehicles believing they were safe and suitable to use on the roads and met ordinary and reasonable consumer expectations for safe and reliable operation. Accordingly, this action seeks to ensure Defendants do not continue to reap economic gains at the expense of the safety of unsuspecting consumers.

---

[1] In this Complaint "the Class" includes both the proposed national class and all subclasses.

## II.      PARTIES, JURISDICTION, AND VENUE

### A.      Plaintiff

9.      Plaintiff, Hannah E. Jones, lives in Des Moines, in Polk County, Iowa. She purchased a 2011 Kia Sportage from Carmax in 2014. When she purchased the Sportage, she had a reasonable expectation that the vehicle had properly designed airbags without a dangerous defect that could cause them to rupture and throw metal shrapnel into her face or throat. The Inflator Defect would have been material to her decision to purchase the vehicle. Had the Inflator Defect been disclosed, she would have declined to purchase the vehicle, or would have paid less for the vehicle considering this significant safety hazard. As a result, she did not receive the benefit of her bargain when she purchased her Sportage.

### B.      Defendants

10.      When Plaintiff refers to a corporate family or family of companies by a single name in this Complaint (such as "Kia Defendants") she is alleging that one or more employees or agents of entities within that corporate family engaged in misconduct on behalf of every company in that family. The individual participants in misconduct did not always distinguish between the entities within a corporate family. As a result, those agents represented the entire corporate family with respect to such conduct.

11.      Defendant ARC Automotive, Inc., ("ARC") is a Delaware corporation with its principal place of business in Tennessee. The Yinyi Group acquired ARC in 2016, making it a wholly owned subsidiary. The Yinyi Group is sometimes collectively included with ARC as "ARC."

12.     Defendant Hyundai Motor Group is a general partnership composed of, *inter alia*, Hyundai Motor Company, Kia Corporation, and Hyundai Mobis Co., Ltd.

13.     Defendant Hyundai Motor Company ("HMC") is a South Korean multinational automotive manufacturer with its headquarters and principal place of business in Seoul, South Korea.

14.     Defendant Hyundai Motor America ("HMA") is a California corporation with its headquarters in Fountain Valley, California. HMA is a subsidiary of HMC.

15.     Defendants HMA and HMC are collectively referred to as "Hyundai" or "Hyundai Defendants." Hyundai vehicles sold in the United States contain Defective Inflators manufactured by ARC.

16.     Defendant Kia Corporation ("Kia Corp.") is a South Korean multinational automobile manufacturer with its headquarters and principal place of business in Seoul, South Korea.

17.     Defendant Kia America, Inc. ("Kia US") is a California corporation with its principal place of business in Irvine, California. Kia US is a subsidiary of Kia Corp.

18.     Defendants Kia US and Kia Corp. are collectively referred to as "Kia" or "Kia Defendants." Kia vehicles sold in the United States contain Defective Inflators manufactured by ARC. The Kia Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Iowa.

19.     The Hyundai Defendants and the Kia Defendants are sometimes referred to collectively as the "Vehicle Manufacturer Defendants."

20.     Defendant Hyundai Mobis Co., Ltd. ("Hyundai Mobis") is a corporation duly organized and existing under the laws of South Korea with its headquarters and principal place of business in Seoul, South Korea. Hyundai Mobis sells and offers for sale in the United States, including Iowa, certain airbags and occupant restraint system components as new and after-sales components for inclusion in automobiles in the United States, and in Iowa, including the Subject Vehicle. Defendant Hyundai Mobis transacts business in this State either alone or through its subsidiaries and derives substantial revenue from business in the State of Iowa.

21.     Defendant Mobis Parts America, LLC ("Mobis Parts") is a Delaware corporation with its principal place of business in Fountain Valley, California. Mobis Parts is a wholly owned subsidiary of Hyundai Mobis and engages in business activities in furtherance of the interests of Hyundai Mobis. Mobis Parts transacts business in this State either alone or through its affiliated enterprises and derives substantial revenue from business in the State of Iowa. Because Mobis Parts transacts business within the State of Iowa, jurisdiction is proper with respect to Mobis Parts. Mobis Parts and Hyundai Mobis are sometimes collectively referred to as the "Airbag Module Defendants."

**C.     Jurisdiction and Venue**

22.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d)(2) and (6) because (i) there are 100 or more Class Members, (ii) there is an aggregate amount in controversy exceeding $5,000,000 exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiff and one Defendant are citizens of different states.

23.     This Court also has subject matter jurisdiction for federal questions pursuant to 28 U.S.C. § 1331 because of Plaintiff's claim based on the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*.

24.     Subject matter jurisdiction is also proper because this Court has supplemental subject matter jurisdiction over Plaintiff's state law claims pursuant to 18 U.S.C. § 1367.

25.     Venue is proper in this judicial district because Defendants transact substantial business in this district and because Plaintiff purchased the vehicle at issue in this district. At least the Vehicle Manufacturer Defendants have advertised in this District and all Defendants have received substantial revenue and profits from sales or leases of the Class Vehicles in this district. Therefore, a substantial part of the events and omissions giving rise to the claims occurred, in part, within this district.

### D.     Personal Jurisdiction – Hyundai Motor Group

#### 1.     Hyundai Motor Group

26.     This Court has personal jurisdiction over Defendant Hyundai Motor Group, a foreign partnership, because it conducts substantial business in the State of Iowa such that it should anticipate being haled into Court here, has an agent in the State of Iowa, because its acts and/or omissions and the consequences thereof resulted in tortious injury to Plaintiff and Class Members in this state, and because some of the actions giving rise to this Complaint took place in this state. This includes sales of the Kia and Hyundai-branded Class Vehicles manufactured and shipped to the United States by Hyundai Motor Corporation containing defective airbag modules manufactured by Hyundai Mobis Co., Ltd. containing Defective Inflators manufactured by ARC.

27.     Hyundai Motor Group is a partnership of multiple corporations including, Hyundai Motor Company, Kia Motors Corporation, and Hyundai Mobis Co., Ltd.

28.     The Hyundai Motor Group partnership is solidified by a series of cross holdings, including:

    i.  Kia Corporation owns approximately 17.33% of Hyundai Mobis Co., Ltd;

    ii.  Hyundai Mobis Co., Ltd. owns approximately 17.28% of Kia Corporation;

    iii.  Hyundai Mobis Co., Ltd. owns approximately 21.43% of Hyundai Motor Company; and

    iv.  Hyundai Motor Company owns approximately 33.88% of Kia Corporation.

29.     The Hyundai Motor Group collectively designs and builds Kia and Hyundai vehicles, integrating component parts from Hyundai Mobis, including ARC sourced inflators, and distributes these vehicles and parts globally, including to the State of Iowa.

30.     Hyundai Motor Group is subject to personal jurisdiction within the State of Iowa because its members, acting as both principals and agents, have transacted business in the State of Iowa, have contracted to supply Class Vehicles and Defective Inflators in the State of Iowa, have produced, manufactured, and distributed vehicles and Defective Inflators with the reasonable expectation that the vehicles and Defective Inflators would be used in the State of Iowa.

31.     Hyundai Motor Group is subject to personal jurisdiction within the State of Iowa because its members are subject to personal jurisdiction within the State of Iowa.

### 2. Hyundai Motor Company

32.     This Court has personal jurisdiction over Defendant Hyundai Motor Company, a foreign corporation, because it conducts substantial business in the State of Iowa such that it should anticipate being haled into Court here, has an agent in the State of Iowa, because its acts and/or omissions and the consequences thereof resulted in tortious injury to Plaintiff and Class Members in this state, and because some of the actions giving rise to this Complaint took place in this state. This includes sales of the Hyundai-branded Class Vehicles manufactured and shipped to the United States by Hyundai Motor Corporation containing Defective Inflators manufactured by ARC.

33.     Hyundai Motor Company owns approximately 33.88% of Kia Corporation.

34.     Hyundai Motor Company is the sole owner of Hyundai Motor America.

35.     Hyundai Motor Company's stated business purposes include (1) the manufacture and sale of all kinds of vehicles, (2) engaging in the import and export business, (3) wholesale of vehicle parts and automobile supplies, (4) engaging in the development and sales of resources overseas, and (5) to operate all related businesses. Hyundai Motor Company's charter specifically allows that it may establish factories, branch offices, or sub-branch offices away from its home location.

### 3. Hyundai Motor America

36.     This Court has personal jurisdiction over Defendant Hyundai Motor America ("HMA") a foreign corporation because it conducts substantial business in the State of Iowa such that it should anticipate being haled into Court here, has an agent in the State of Iowa, sells its vehicles in Iowa through a dealership network with the intent that its vehicles

would be purchased and used in Iowa, maintains websites in which Iowa residents can communicate with Hyundai Motor America, corresponds with Iowa residents with respect to recalls, warranty issues, and technical service bulletins, because its acts and/or omissions and the consequences thereof resulted in tortious injury to Plaintiff and Class Members in this state, and because some of the actions giving rise to this Complaint took place in this state.

37.     Hyundai Motor America is wholly owned by Hyundai Motor Company.

### 4.     Kia Corporation

38.     This Court has personal jurisdiction over Defendant Kia Corporation, a foreign corporation, because it conducts substantial business in the State of Iowa such that it should anticipate being haled into Court here, has an agent in the State of Iowa, because its acts and/or omissions and the consequences thereof resulted in tortious injury to Plaintiff and Class Members in this state, and because some of the actions giving rise to this Complaint took place in this state. This includes sales of the Kia-branded Class Vehicles manufactured and shipped to the United States by Kia Motors Corporation containing Defective Inflators manufactured by ARC.

39.     Kia Motors Corporation changed its name to Kia Corporation in 2021.

### 5.     Kia America, Inc.

40.     This Court has personal jurisdiction over Defendant Kia America, Inc., a foreign corporation, because it conducts substantial business in the State of Iowa such that it should anticipate being haled into Court here, has an agent in the State of Iowa, sells its vehicles in Iowa through a dealership network with the intent that its vehicles would be

purchased and used in Iowa, maintains websites in which Iowa residents can communicate

with Kia US, corresponds with Iowa residents with respect to recalls, warranty issues, and

technical service bulletins, because its acts and/or omissions and the consequences thereof

resulted in tortious injury to Plaintiff and Class Members in this state, and because some

of the actions giving rise to this Complaint took place in this state.

41.     Kia Motors America, Inc. changed its name to Kia America, Inc. in 2021.

**6.     Hyundai Mobis Co., Ltd.**

42.     This Court has personal jurisdiction over Defendant Hyundai Mobis Co.,

Ltd., a foreign corporation, because it conducts substantial business in the State of Iowa

such that it should anticipate being haled into Court here, has an agent in the State of Iowa,

sells its products in Iowa through a dealership network with the intent that its products

would be purchased and used in Iowa, because its acts and/or omissions and the

consequences thereof resulted in tortious injury to Plaintiff and Class Members in this state,

and because some of the actions giving rise to this Complaint took place in this state.

43.     Hyundai Mobis Co., Ltd. is the sole owner of Mobis America, Inc., which in

turn is the sole owner of Mobis Parts America, LLC.

44.     Hyundai Mobis Co., Ltd. is the owner of the former sales divisions for motor

parts for after-sales service for Hyundai and Kia vehicles, which were formerly owned by

Hyundai and Kia, respectively.

45.     Hyundai Mobis Co., Ltd. has two distinct methods for directing its products

to the State of Iowa:

i.  Hyundai Mobis Co., Ltd. uses the partnership network known as Hyundai Motor Group to sell its component parts, including airbag modules incorporating ARC inflators to Hyundai Motors and Kia Corporation for installation into new vehicles, which are then distributed through the Hyundai Motor Group dealership network to citizens of Iowa.

ii.  Hyundai Mobis Co., Ltd. also sells replacement parts to new and used car dealerships, as well as repair shops both through the Hyundai Motor Group network via Hyundai and Kia and through Hyundai Mobis Co., Ltd.'s wholly owned subsidiary, Mobis Parts America. This distribution procedure applies to airbag modules incorporating ARC inflators as each airbag module must be replaced after every accident involving a commanded deployment.

### 7.  Mobis Parts America

46.   This Court has personal jurisdiction over Defendant Mobis Parts America, a foreign corporation, because it conducts substantial business in the State of Iowa such that it should anticipate being haled into Court here, has an agent in the State of Iowa, sells its products in Iowa through a dealership network with the intent that its products would be purchased and used in Iowa, because its acts and/or omissions and the consequences thereof resulted in tortious injury to Plaintiff and Class Members in this state, and because some of the actions giving rise to this Complaint took place in this state.

### E.      Defendants' Agents

47.     ARC, the Vehicle Manufacturer Defendants, and the Airbag Module Defendants acted as agents for each other with respect to the acts and violations alleged in this Complaint.

48.     Various persons, partnerships, sole proprietors, firms, and corporations not named as defendants in this Complaint, whose identities are presently unknown, have participated as agents with the Defendants in the offenses alleged herein, and have performed acts and made statements in furtherance of the misconduct and concealment alleged.

49.     Whenever this Complaint refers to any act, deed, or transaction of any corporation or limited liability entity, the allegation means the corporation or entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or other entity's business or affairs.

### F.      Aiding and Abetting

50.     Defendants harmed Plaintiff and the Class through Defendants' misconduct and concealment. Defendants are responsible for the harm because the Airbag Module Defendants and Vehicle Manufacturer Defendants aided and abetted ARC in committing the misconduct and concealment.

51.     Although ARC is responsible for manufacturing the Defective Inflators, the Airbag Module Defendants are responsible for procuring, testing, and approving the Defective Inflators, and the Vehicle Manufacturer Defendants are responsible for installing

them in Class Vehicles and selling the Class Vehicles to consumers. The Airbag Module Defendants and Vehicle Manufacturer Defendants are responsible as aiders and abettors because they were aware that ARC manufactured driver and passenger toroidal stored gas hybrid inflators using ammonium nitrate and the potential dangers associated with such inflators. Nevertheless, the Airbag Module Defendants and Vehicle Manufacturer Defendants approved the design, ordered the production, and installed the Defective Inflators, thereby showing that they had the specific intent to facilitate the misconduct that ARC undertook. At a minimum, the Airbag Module Defendants and Vehicle Manufacturer Defendants were liable as aiders and abettors of ARC's tortious conduct, breaches of warranty, and statutory violations alleged herein. These Defendants' conduct was a substantial factor in causing harm to consumers who ultimately and unknowingly purchased or leased Class Vehicles containing Defective Inflators.

## III.   ADDITIONAL FACTUAL ALLEGATIONS

### A.   How Airbags Work.

52.   In a vehicle crash, seat belts are designed to restrain the drivers' and passengers' bodies from striking the steering wheel or other hard surfaces in the passenger compartment. However, seat belts impose limited restraints on the occupant's heads, allowing heads to strike harmful parts of the car.[2]

---

[2] Lesics, *Airbags | How Do They Work*? https://www.youtube.com/watch?v=qCIes_xJdGo (accessed November 21, 2022).



53.     Properly implemented, airbags inflate and then begin to deflate in a crash in order to cushion the occupant's heads from such impacts. Traditionally, dramatic changes in the car's forward movement unloosed a ball bearing, which flipped a switch to start the inflation process. More recently, wheel speed sensors work with gyroscopes, an electronic control unit, and other sensors to commence inflation.



54.     The initiation of the inflation should take only two milliseconds. The airbag inflates in another 20–30 milliseconds and should be deflating by the time the occupant's head hits the airbag, closer to 100 milliseconds into the crash.

55.     Electrical impulses traditionally set off a chemical reaction in the inflator mechanism that inflates the airbag.[3]

 

**B.     Airbag Inflators' Design, Assembly, and Placement.**

56.     ARC has a long history of developing propellants for use in rocket motors and airbag inflators, among other products. The company was formed as Atlantic Research Corporation in 1949 to develop propellants for the United States Department of Defense. ARC first supplied passenger-side airbag inflator propellants in 1970 and developed its first hybrid passenger inflators as part of a joint venture with Allied Signal in 1993.

---

[3] *Airbag Inflators*, CVEL Automotive Electronics, https://cecas.clemson.edu/cvel/auto/actuators/airbag.html (accessed November 20, 2022).

57.     The airbag inflator is a metal canister that produces the gas that fills an attached airbag cushion or bag.

58.     The Defective Inflators are toroidal stored gas hybrid inflators, which means they are shaped like a small, circular can (toroidal) and are comprised mostly of highly compressed gas, with a secondary chemical compound propellant used to heat the stored gas so that it expands sufficiently to fill the airbag cushion. When the vehicle signals a crash, the inflator is designed to release the stored gas, and then ignite the propellant to heat the released gas in a stored manner.

59.     A housing or canister, shaped to fit in the driver or passenger area of the vehicle, contains the inflator. Passenger inflators are often tubular in shape to fit in the dashboard area, while driver inflators are typically disc shaped to fit in the steering wheel. In turn, the inflators are attached to different air bags, which are also shaped to fit in specific passenger or steering wheel compartments.

**C.     The ARC Inflator Supply Chain.**

60.     ARC is considered a Tier 2 automotive supplier because it supplies automotive components to a Tier 1 supplier, which then supplies automotive parts to an Original Equipment Manufacturer (OEM). ARC manufactures the inflators, which it supplies to airbag system manufacturers, who assemble the airbag module that includes the ARC inflator. In this situation, Hyundai Mobis and Mobis Parts (here the Airbag Module Defendants) fulfill the role of the Tier 1 suppliers for other vehicle manufacturers, but as noted above, they are closer, and are partners of the Hyundai Defendants and Kia Defendants (the Vehicle Manufacturer Defendants).

61.     OEMs typically provide product specifications to their Tier 1 suppliers. The Tier 1 supplier provides the OEM with engineering design information conforming to the OEM's supplier Production Part Approval Process ("PPAP"), which includes specifications detailing the properties, characteristics, testing, and validation of the components that make up the assembly. A Tier 2 supplier like ARC typically provides similar documentation to its Tier 1 correspondents. The OEM examines this information and approves it before production begins.

62.     When an issue arises with an automotive part like the airbag module assembly or one of its components like the inflator, the OEM typically requests to examine design and validation testing for all relevant components. By the time the ARC Defective Inflators began rupturing and NHTSA began investigating, the Vehicle Manufacturer Defendants had examined, or should have examined, all documentation related to ARC's inflators, including the construction and the type of chemicals used in the propellant. The Vehicle Manufacturer Defendants would have worked with ARC and the Tier 1 airbag module assembly supplier during these evaluations.

## D.     ARC's Stored Gas Hybrid Inflators Contain Dangerous Ammonium Nitrate-Based Propellant.

63.     Airbag propellants are created by compounding a mixture of chemicals, which typically include a fuel and an oxidizer. Most inflator manufacturers use a variant of guanidine nitrate as the fuel in their propellant in frontal impact airbag designs. Other

airbag makers have used a variant of guanidine nitrate, which experts have called a less risky and more durable propellant chemical.[4]

64.     A small number of airbag propellant manufacturers have used ammonium nitrate in the past as a fuel alternative due to cost savings. Ammonium nitrate, commonly used as a fertilizer, is well known for making inexpensive explosives. For example, experts testified the bomb that destroyed the Oklahoma City Federal Building was probably made with ammonium nitrate.[5] Investigations suggest several, and likely a majority of other companies use alternate designs that cost somewhat more than ammonium nitrate but are still profitable and offer a substantial increase in safety over ammonium nnitrate-based designs.

65.     Despite the availability of these alternate propellants, ARC has used ammonium nitrate in its secondary propellant since at least 2001. Secondary propellant ignites after the initial ignition, which in the ARC inflators is the release of the stored gas.

66.     Ammonium nitrate is volatile and must be precisely phase-stabilized to mitigate its explosive characteristics, which exposure to fluctuating temperature cycles exacerbates. Motor vehicles routinely expose airbags to such fluctuating temperatures. Most in the scientific, research, safety, OEM, and supplier manufacturing communities consider using ammonium nitrate overly risky and inappropriate, even when it is phase-stabilized, or PSAN.

---

[4] Hiroko Tabuchi, *Takata's Switch to Cheaper Airbag Propellant Is at Center of Crisis*, N.Y. Times (Nov. 19, 2014).

[5] Jo Thomas, *Experts Testify on Composition of Bomb in Oklahoma City Blast*, N.Y. Times (Dec. 2, 1997).

67.     PSAN's faster dynamic burning rate also means that an airbag can rupture if the vents are inadequate or obstructed, even without high temperatures and moisture exposure in vehicles. Ford noted in its recall report that its preliminary analysis indicated "that weld flash from the inflator canister welding process at the Tier 2 inflator supplier may obstruct the gas exhaust port." Weld flash or pieces of debris blocking exhaust ports can complicate over-pressurization and lead to an explosive rupture.

68.     The design of the Defective Inflators requires welding them using a friction welding process, in which friction is created between the two shells of the inflator through rotation, generating heat that causes the steel material to soften and fuse the pieces together. As the high-speed rotation and force used in friction welding softens the metal, some of the material splashes out if the weld, creating weld flash when it hardens. In the ARC inflators, both the outside shells and the internal column in the center of the inflator are bonded through friction welding and can result in flash. The pieces of flash weld inside the inflator are not visible.

69.     When a manufacturer selects the type of welding process it wants to use in its design, the process must be designed either to have a machine remove the weld flash after the weld is completed or incorporate the weld flash into the component's design. The flash can be minimized or removed by various welding parameters, and the component manufacturer is responsible for selecting a welding machine and process that incorporates the appropriate parameters.

70.     Although welding itself is a manufacturing process, the type of welding used for a component is incorporated into the design, and friction welding does not involve

operating skill. Therefore, ARC's selecting friction welding that did not minimize flash and ensure all flash was removed was a design defect. This defective design can allow pieces of weld flash to obstruct the exhaust port, and the resulting over-pressurization is exacerbated by using PSAN, leading to explosive ruptures.

71.     According to a *New York Times* article from 2016, ammonium nitrate is about 30 percent cheaper than other chemicals that can be used in propellants. In the late 1990s, another inflator manufacturer, Autoliv Inc., began testing PSAN-based inflators and determined that PSAN can generate gas so fast that it "blows the inflater to bits."[6] A team testing one inflator saw an explosive result that "totally destroyed the fixture." Despite pressure from General Motors due to potential cost savings, Autoliv "just said, 'No we can't do it. We're not going to use it.'" TRW used ammonium nitrate with additional safeguards, but found the safeguards were not cost-effective, and abandoned ammonium nitrate in 2006. Both Autoliv and TRW were using a propellant based on guanidine nitrate as of 2016.[7] Design specifications by the United States Council on Automotive Research required Inflators to be evaluated for their "resistance to temperature aging in an environment of high humidity" to evaluate the damaging effects of moisture and temperature changes on airbag explosives.[8]

---

[6] Hiroko Tabuchi, *A Cheaper Airbag, and Takata's Road to a Deadly Crisis*, N. Y. Times (Aug. 26, 2016).

[7] *Id.*

[8] *Id.*

72.     In 2014, another Inflator manufacturer—Takata Corporation—generated substantial attention to using PSAN-based propellant when it came out that Takata and various automotive manufacturers were aware of multiple driver and passenger inflators covering several model years. The Takata inflator ruptures injured hundreds of people and killed at least 27 people worldwide.

73.     Despite industry knowledge PSAN is thermally unstable, excessively hygroscopic, and unstable with temperature recycling, ARC continued to use PSAN in its inflators' secondary propellant for the entire time Takata used it in its main propellant.

**E.     ARC's Dangerous Design and Production Process.**

74.     The Defective Inflators are a hybrid technology that uses both a propellant explosive and stored compressed gases to rapidly inflate the air bag.

75.     Defendant ARC has sold various hybrid inflators since 2001, but they all share the same "donut" housing shape. ARC designates driver-side hybrid toroidal inflators as CADH/DH-7 (single stage) and DCADH (dual stage). The passenger-side designations are PH7-90, PH7-120 (single stage), and PH7-120, DPH7 (dual stage).

76.     ARC's hybrid design relies on two energy sources. First, the inflator fills the airbag cushion by releasing a stored inert gas at high pressure. The gas mixture is augmented by an ammonium nitrate-based propellant. The pressurized gas mixture and propellant are contained in a hermetically sealed steel housing and are therefore isolated from external atmospheric conditions. The ARC hybrid inflators are manufactured in both single and dual stage designs.

77.     ARC hybrid inflators use friction welding to join the three inflator housing components together. The inflator's housing components consist of an upper pressure vessel, a lower pressure vessel and center support.



**Above: An exploded view of sections of the ARC hybrid inflator sections.**

78.     Friction welding is a welding technique in which mechanical friction between a moving component and a stationary component generates heat. At the same time, the technique applies a lateral force called an 'upset' to the parts, in order to plastically displace and fuse the material.

79.     ARC hybrid inflators use three separate friction welds. The first friction weld is between the lower pressure vessel and the center support. The second friction weld is between the center support and the upper pressure vessel. The third and final friction weld joins the lower and upper pressure vessels together. Friction welds 2 and 3 are performed during the same operation.

80.     As friction welding seals the components together, the process creates flash. Controlled and consistent flash creation is a normal and expected by-product of the friction welding process.

81.     When friction welding tube shaped components, such as ARC's center support, flash is created on both the inner and outer parts of the center support where the center support interfaces with the pressure vessel (or outer housing).



**Above: Flashing on the inner diameter of the support tube of an exemplar ARC hybrid inflator.**

82.     If certain parameters, such as part to part alignment, rotational speed, or the force applied to the parts being welded are out of specification during friction welding, excess flash will collect at the mating points of the parts being welded. However, the welded seems are required to be properly aligned and welded by a method that provides clean, uniform joints with adequate penetration.

83.     ARC's design defect and subsequent manufacturing defect involves the friction weld between the upper pressure and the center support that is adjacent to the gas

exit port where excess, asymmetrical weld flash is created at the support tube inner diameter to upper pressure vessel interface.



**Above: Views of excess, asymmetrical weld flash at the support tube inner diameter to upper pressure vessel interface in field collected ARC hybrid inflators collected.**

84.     During deployment the excess weld flash can dislodge from the friction weld and travel to the adjacent gas exit orifice.

85.     If the dislodged weld flash is not large enough to block the gas exit orifice, the dislodged weld flash will exit the inflator.

86.     If the dislodged weld flash is large enough to block the gas exit orifice, the dislodged weld flash will result in an increase of pressure in the inflator housing.

87.     As the internal pressure of the inflator increases due to the gas exit port restriction, the toroidal housing expands, deforms, and changes shape from the toroidal shape to more of a ball shape until it reaches the point of rupture.

88.     During a driver side rupture of an ARC hybrid inflator, the inflator housing expands due to the excessive internal pressure. Simultaneously, the center report restricts the expansion and is stretched as the inflator housing expands. The inflator housing stretches at its weakest points, which are the stage 1 and stage 2 gas ports located at the middle of the center support, and fractures under tension at these locations. After the center

support fractures, the gas exit port end of the center support breaks free of the upper pressure vessel and is propelled towards the driver.

89.     When the inflator housing ruptures, internal components of the inflator are propelled into the passenger compartment and can injure or kill the occupants.

90.     In addition to propelling internal inflator components towards the driver, the entire module assembly may also break free of the steering wheel and strike the driver, which can also cause injury or death.

91.     The mounting position, orientation, and location of passenger side ARC hybrid inflators, in the passenger's side dashboard, compared to the driver's side inflator, reduces but does not eliminate the risk of injury or death. ARC's passenger side hybrid inflators are mounted in an angled, vertical position with the gas exit port pointing towards the windshield. This orientation, and the inflator's location in the dashboard, reduces the probability of the type of injuries associated with the driver's side inflators.

92.     As of May 17, 2022, all of the North American field events but one involved a rupture of the driver's side inflator, including the two fatalities.

**F.     Vehicle Manufacturer Defendants Have Known the Dangers of ARC's Inflators and of Ammonium Nitrate.**

93.     The Vehicle Manufacturer Defendants have known of the hazards of their inflators since at least 2015. In June 2014, Kia notified NHTSA of a lawsuit that said an inflator had ruptured in an Optima sedan in New Mexico, injuring the driver. Federal investigators found that, and another incident involved inflators ARC made that used

ammonium nitrate.[9] In July 2016, a 2009 Hyundai Elantra driver died when the driver's side airbag exploded after a low-speed collision in Newfoundland.[10]

94.     At least seven known ruptures of ARC's Defective Inflators have occurred in vehicles, including six driver inflators and one passenger inflator. Two ruptures resulted in drivers' deaths. Two other passenger inflators ruptured during Lot Acceptance Testing at ARC's factory.

95.     These ruptures have occurred in various states that do not share similar climates, unlike the hot and humid climates Takata ruptures often involve. The Defective Inflators involved were made at various ARC factories and included both single-stage and dual-stage inflators. These facts strongly suggest a systemic design defect in the inflators—especially use of PSAN-based propellant—rather than a manufacturing defect occurring at one factory. Their occurring outside moisture intrusion situations indicate other factors can trigger them, further challenging use of ammonium nitrate.

96.     NHTSA noted ARC's glaring and persistent manufacturing and quality control problems in an October 2016 letter, noting ARC's lack of information provided to NHTSA, and ARC's denying it had any obligation to provide information voluntarily. In 2018, ARC reportedly began a system to visually inspect the upper vessel of its inflators to support tube friction welds before sale.

---

[9] Hiroko Tabuchi, *Airbag Flaw Investigated at ARC Automotive*, N.Y. Times (July 14, 2015).

[10] Hiroko Tabuchi, *Another Airbag Maker is Under Scrutiny After Fatal Rupture*, N.Y. Times (Aug. 4, 2016).

97.     TK Holdings, the survivor of Takata's corporate reorganization, brought suit against ARC alleging ARC breached its contract with Takata by supplying products with improper welding. TK Holdings alleged the inflators were not reasonably fit for their intended, anticipated, or reasonably foreseeable use.

98.     NHTSA has been overseeing an investigation of ARC's inflators that commenced on July 27, 2015. The vehicle manufacturers have issued a series of partial, confusing, and ineffective recalls to address the airbag defects.

99.     An October 4, 2016, letter from NHTSA's Office of Defect Investigation to ARC's CEO noted ARC had failed to notify NHTSA of multiple incidents involving ARC products. ARC has questioned whether it needs to provide information to NHTSA, has failed to provide documents in a readable format, and reportedly appeared nonchalant about its testing.

**G.     Defendants' Misconduct and Economic Injury to Plaintiff and the Class.**

100.    Like other ordinary consumers, Plaintiff reasonably believed when purchasing her Class Vehicle that the vehicles were equipped with safe airbags that did not have a dangerous propensity to shoot shrapnel into their faces, throats, torsos, and limbs, or those of other vehicle occupants. The safe, reliable, and proper functioning of an airbag inflator is a material component of an automobile purchase or lease because it is required to ensure that the vehicle can safely and properly operate. Accordingly, the ordinary reasonable consumer would have considered the Inflator Defect to constitute an important and material part of deciding whether to spend money to purchase or lease a Class Vehicle.

101.   Defendants were aware that consumers did not expect that their airbags would have a dangerous propensity to shoot metal shrapnel and had readily available means to convey that information to Plaintiff and the Class—including through on-vehicle labeling, stickers, and placards, through owner manuals, brochures, and pamphlets, through advertising for the Class Vehicles, and through full and complete disclosure by way of recalls. Plaintiff and the Class were exposed to such materials information prior to purchasing or leasing their Class Vehicles, and the time of purchase or lease (through interactions with Vehicle Manufacturer Defendants' sales employees and other agents), and every day they sat in their Class Vehicles. Indeed, Defendants had one obvious location to convey a warning about an airbag defect: on the steering wheel itself, an item the driver cannot help but see before ever driving the car.

102.   Defendants nonetheless chose not to warn about or disclose the Inflator Defect at any point in time. The Defendants' concealment succeeded because each entity in the chain between ARC and the Vehicle Manufacturer Defendants remained silent about the Inflator Defect—resulting in the public, prospective purchasers and lessees, automobile dealerships, automobile retailers, and automotive repair and service facilities remaining unaware of the Inflator Defect, which successfully prevented any warning to Plaintiff and the Class. The foreseeable and intended effect of the Defendants' concerted silence was that they all continued to profit from the sale, service, and use of the Defective Inflators and Class Vehicles equipped with those inflators—with consumers bearing all the safety risks and suffering economic losses as a result.

103.    Defendants intended to mislead and in fact misled reasonable consumers—including Plaintiff and the Class—through their concealment of the Inflator Defect. Defendants did so with the intent to generate and increase sales of the Class Vehicles, thereby increasing Defendants' relative share of the automotive components and automobile vehicle markets.

104.    The Class Vehicles have a diminished value compared to the price they commanded when purchased or leased by Plaintiff and the Class because neither the market nor any reasonable consumer would ignore the potential danger involved in an airbag shooting metal shrapnel into the driver and passengers when assessing the value of an automotive vehicle and whether to purchase or lease it. Consequently, Plaintiff and the Class paid more for their Class Vehicles than they otherwise would have because of the diminished value caused by Defendants' concealment of the Inflator Defect.

105.    Because the existence of the Inflator Defect in the Class Vehicles would have been patently material to any reasonable consumer had it been disclosed, Plaintiff and the Class would not have purchased or leased the Class Vehicles or would not have paid as much for them were the Inflator Defect not concealed.

106.    By concealing the Inflator Defect, Defendants implicitly distorted and misrepresented the true value of every Class Vehicle such that Plaintiff and the Class received a vehicle of different and substantially lesser value—one with a higher effective cost—than they reasonably believed they were receiving. Stated differently, Plaintiff and the Class surrendered more and acquired less in their transactions than they would have if Defendants had disclosed the Inflator Defect in the Class Vehicles. Accordingly, Plaintiff

and the Class did not realize the benefit of their bargain in purchasing or leasing the Class Vehicles, and their expectations as ordinary reasonable consumers were not met.

107.   Plaintiff and the Class paid substantially more than the market value represented by the price bargained for. Plaintiff and the Class bargained on a particular market value for their respective Class Vehicles. But because Defendants' misconduct and concealment resulted in Plaintiff and the Class receiving less than they bargained for, Plaintiff and the Class effectively paid a price that was higher than that reflected in the market price that they paid.

108.   For these reasons, every Class Vehicle is worth less than Plaintiff and the Class paid.

109.   Through the use of misleading representations and concealment of the Inflator Defect, Defendants commanded a price for every Class Vehicle that exceeded what Plaintiff and the Class would have paid had they been fully informed.

110.   Absent the false and misleading representations, Plaintiff and the Class would only have been willing to pay less for the Class Vehicles, if they were willing to purchase them at all.

111.   In short, the cost of every Class Vehicle would have been lower absent Defendants' misconduct and concealment.

112.   Defendants' misconduct and concealment also created and sustained increased market demand for the Class Vehicles and increased Defendants' market share relative to what consumer demand and Defendants' market share would have been had they not concealed the Inflator Defect. Plaintiff and the Class lost money as a result because

they did not receive what they reasonably believed they were paying for due to Defendants' misrepresentations and their concealment of the Inflator Defect, while Defendants realized a commensurate gain because they did not deliver to Plaintiff and the Class what they reasonably expected to receive in exchange for the money they paid.

113.   Plaintiff and the Class detrimentally altered their positions and suffered damages in an amount no less than the difference in value between what they reasonably believed they were paying for and what they actually received.

## IV.   TOLLING THE STATUTE OF LIMITATIONS

### A.   Plaintiff Did Not And Could Not Discover Her Claims.

114.   Plaintiff and the Class had no knowledge of the misconduct and concealment alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth until August 2020 when the NHTSA expanded its Engineering Analysis to include "toroidal shaped hybrid air bag inflators, both passenger and driver side" and requested additional information form ARC specifically regarding the PH7 toroidal shaped hybrid front passenger airbag inflator "to facilitate its investigation of the potential risk of deployment-related field rupture."

115.   Plaintiff and the Class are consumers who purchased or leased Class Vehicles. No information in the public domain was available to the Plaintiff and the Class before August 2020 that revealed sufficient information to suggest that Defendants were involved in the misconduct or concealment alleged herein. Therefore, the statute of limitations did not begin to run because Plaintiff and the Class did not and could not

discover their claims, or in the alternative, because fraudulent concealment tolled the statute of limitations until, at the earliest, August 2020.

116.    Plaintiff and the Class had no means of obtaining any facts or information concerning any aspect of ARC's dealings with the Airbag Module Defendants and the Vehicle Manufacturer Defendants, much less the fact that they had engaged in the misconduct and concealment alleged herein.

117.    For these reasons, the statute of limitations as to Plaintiff's and the Class's claims did not begin to run and has been tolled with respect to the claims that Plaintiff and the Class allege in this Complaint.

### B.        Fraudulent Concealment Tolled the Statute of Limitations.

118.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the Class. Plaintiff and the Class did not discover, and could not discover through the exercise of reasonable diligence, the existence of the misconduct and concealment alleged herein until when NHTSA expanded its Engineering Analysis to include "toroidal shaped hybrid air bag inflators, both passenger and driver side" and requested additional information from ARC specifically regarding the PH7 toroidal shaped hybrid front passenger airbag inflator "to facilitate its investigation of the potential risk of deployment-related field rupture" at the very earliest.

119.    Before that time, Plaintiff and the Class were unaware of Defendants' unlawful conduct and did not know before then that they purchased or leased, and overpaid, for Class Vehicles containing Defective Inflators throughout the United States. Little or no

information, actual or constructive, was ever made available to Plaintiff or members of the Class that even hinted to Plaintiff that she was being injured by Defendants' misconduct and concealment.

120.    Defendants' affirmative acts alleged herein, including acts in furtherance of the misconduct, were wrongfully concealed, and carried out in a manner that precluded detection.

121.    By its very nature, the Defendants' misconduct was inherently self-concealing. Airbags and their components are not exempt from safety regulation and, thus, Plaintiff and the Class reasonably considered that the Class Vehicles, including all the automotive parts and components contained therein, that they purchased or leased met or exceeded safety regulations. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' conduct before August 2020 at the very earliest. Plaintiff and the Class could not have discovered the misconduct or concealment at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants to avoid detection of, and fraudulently conceal, their misconduct.

122.    Because the misconduct was both self-concealing and affirmatively concealed by Defendants, Plaintiff and the Class had no knowledge of the misconduct, or of any facts or information that would have caused a reasonably diligent person to investigate whether misconduct existed, until August 202 at the very earliest.

123.    For these reasons, the statute of limitations as to Plaintiff's and the Class's claims did not begin to run and has been tolled with respect to the claims that Plaintiff and the Class have alleged in this complaint.

## V.    CLASS ALLEGATIONS

124.    "Class Vehicles" refers to all vehicles containing the defective toroidal stored gas hybrid inflators manufactured by ARC for which there are representative Plaintiffs. Plaintiff intends to amend this Complaint to add additional representative Plaintiffs and Class Vehicles after further investigation and discovery.

125.    The Class Vehicles are equipped with driver and passenger airbags containing Defective Inflators. The Defective Inflators suffer from a common, uniform defect that renders them vulnerable to rupturing and ejecting metal shrapnel. Certain Vehicle Manufacturer Defendants have recalled various Class Vehicles based on the Defective Inflators. Based on the incomplete, pre-discovery information available at this time, and subject to additions and revisions based on information unearthed in discovery, the Class Vehicles include those listed in the following table of Hyundai vehicles with ARC hybrid inflators:

| Hyundai | Hyundai | Accent | 2012-2017 |
| Hyundai | Hyundai | Azera | 2006-2011 |
| Hyundai | Hyundai | Elantra | 2007-2017 |
| Hyundai | Hyundai | Genesis | 2009-2013 |
| Hyundai | Hyundai | Sonata | 2009-2010 |
| Hyundai | Hyundai | Tiburon | 2003-2005 |
| Hyundai | Hyundai | Tucson | 2005 |
| Hyundai | Hyundai | Tucson | 2007-2010 |
| Hyundai | Hyundai | XG350 | 2002-2005 |

126.   Class Vehicles include those in the following table that similarly preliminarily lists Kia vehicles with ARC hybrid inflators:

| Kia | Kia | Amanti | 2006-2009 |
| Kia | Kia | Forte | 2014-2016 |
| Kia | Kia | Optima | 2001-2006 |
| Kia | Kia | Rio | 2009-2011 |
| Kia | Kia | Rondo | 2007-2010 |
| Kia | Kia | Sedona | 2006-2014 |
| Kia | Kia | Sportage | 2005-2016 |

127.   Each of the Class Vehicles were the subject of manufacturer's representation that the vehicles conformed to all applicable federal motor vehicle safety and theft prevention standards in effect on the date of manufacture. Without this representation from the Vehicle Manufacturer Defendants, the Class Vehicles would not have been sold to Class Members, including Plaintiff.

128.   The Defective Inflators ARC manufactured are identifiable, discrete physical products that remain essentially unchanged when incorporated into a Class Vehicle. As a result, the Defective Inflators follow a traceable physical chain of distribution from ARC to the Airbag Module Defendants, to the Vehicle Manufacturer Defendants, to automobile dealerships and retailers, and then to Plaintiff and the Class.

129.   Defective Inflators that are incorporated into the assembly contain markings identifying ARC as the manufacturer on a small label on the component. Defective Inflators can therefore be physically traced through the supply chain.

130.   Pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3), Plaintiff brings this action on behalf of a proposed **National Class** defined as follows:

> *All persons in the United States who currently own, lease or*
>
> *leased, a Class Vehicle in the United States.*

131.    Additionally, pursuant to Rules 23(b)(2) or 23(b)(3), Plaintiff will also or alternatively seek certification of an **Iowa Subclass** defined as follows:

> *All persons who currently own or lease or leased a Kia or*
>
> *Hyundai Class Vehicle in Iowa.*

132.    Unless otherwise stated, the term "Class" refers jointly and severally to the National Class and the Iowa Subclass.

133.    Excluded from the Class are: (a) each Defendant and its board members, executive-level officers, attorneys, and immediate family members of such persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Inflator Defect; and (d) all persons who timely and properly exclude themselves from the Class.

134.    **Numerosity—Fed. R. Civ. P. 23(a)(1)**. The members of the proposed Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.

135.    Although Plaintiff does not know the precise number of Class members, upon information and belief the Class would easily number in the thousands if not tens of thousands.

136.    Each of the Classes and their true size should be ascertainable because Class members can readily be identified using registration records, sales records, production

records, and other information kept by ARC and the Vehicle Manufacturer Defendants or third parties in the usual course of business and within their control.

137.    **Typicality—Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of other Class members' claims because Plaintiff and the Class all purchased or leased a Class Vehicle containing Defective Inflators. All received less than full value Class Vehicles due to the Inflator Defect and the Vehicle Manufacturer Defendants' representations or Defendants' omissions. Class members, like Plaintiff, would not have purchased the Class Vehicles or paid as much had Defendants not misrepresented the safety of the Class Vehicles or concealed and omitted to disclose the Inflator Defect, which was unknown to Plaintiff and to Class members alike.

138.    Plaintiff and the Class were all exposed to the same or substantially the same misrepresentations and the same omissions—namely, concealment of the Inflator Defect.

139.    Plaintiff and each Class member sustained economic damages that are calculable on a class-wide basis. The claims all arise from a single course of conduct and each Class member would individually make similar legal and factual arguments to establish Defendants' liability.

140.    There are no defenses available that are unique to Plaintiff.

141.    **Commonality & Predominance—Fed. R. Civ. P. 23(a)(2) & 23(b)(3).** Plaintiff and the Class are united by a community of interest in obtaining appropriate remedies, including injunctive relief, repair, or replacement of the defective vehicles or vehicle components, restitution, damages, and other available relief designed to redress Defendants' wrongful conduct. This action involves questions of law and fact that are

common to Plaintiff and the Class, that are susceptible to common answers, and that predominate over any individual questions specific to Plaintiff or any members of the Class. These issues include:

a. Whether the subject airbag inflators are defective;

b. Whether the Class Vehicles are equipped with Defective Inflators;

c. Whether Defective Inflators in the Class Vehicles pose an unreasonable safety risk or are otherwise material to reasonable consumers;

d. Whether an ordinary reasonable consumer would have purchased or leased a Class Vehicle had they known of the Inflator Defect;

e. Whether an ordinary reasonable consumer would have paid less money to purchase or lease a Class Vehicle had they known of the Inflator Defect—and if so, the diminution in Class Vehicle value that the Inflator Defect would have caused;

f. Whether the Class Vehicles commanded a market premium because the Inflator Defect had not been disclosed to the public;

g. Whether Plaintiff and the Class were denied the benefit of their bargain because of the undisclosed Inflator Defect;

h. Whether Defendants had actual or constructive knowledge of the Inflator Defect;

i. When Defendants first had actual or constructive knowledge of the Inflator Defect;

j. Whether Defendants had a duty to disclose the Inflator Defect before or at the time Plaintiff and the Class purchased or leased their respective Class Vehicles;

k. Whether Defendants had and have an ongoing duty to disclose the Inflator Defects;

l.  Whether Defendants breached their express or implied warranties for the Class Vehicles and Defective Inflators;

m.  Whether Defendants violated the Magnuson-Moss Warranty Act;

n.  Whether Defendants violated laws prohibiting unfair and deceptive trade practices or similar consumer protection laws;

o.  Whether Defendants' conduct unlawfully concealed the Inflator Defect;

p.  Whether Defendants' conduct was knowing and willful;

q.  Whether Defendants were unjustly enriched by receiving Plaintiff's and the Class members' money for the Class Vehicles;

r.  Whether Defendants should be ordered to disgorge all or part of the monies received from Plaintiff and the Class for the Class Vehicles;

s.  Whether Plaintiff and the Class are entitled to damages, injunctive relief, restitution, or other relief sought in this Complaint; and

t.  The amounts to which Plaintiff and the Class are entitled.

142.    These common issues will drive the resolution of the litigation in that their determination will resolve in one stroke issues that are central to the validity of each Class members' claims.

143.    The factual and legal issues identified above (a) remain common to the Class, (b) arise from a common course of conduct and systemic policy decisions made by Defendants; (c) predominate in number and importance over questions that may not be common to the Class; and (d) preclude neither class-wide calculation of damages nor the

methodological determination of how such damages should be allocated among Class members.

144.    **Adequacy of Representation—Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other Class members. Plaintiff commits to protecting the interests of the Class without exercising personal interest or otherwise acting in a manner inconsistent with the best interests of the Class generally. Plaintiff has retained counsel with substantial experience in handling complex litigation, including extensive class action experience and experience in handling consumer protection and product liability cases, including automobile defect claims. The firms and counsel for Plaintiff's firms have substantial trial experience. Plaintiff and her attorneys will responsibly, ethically, and vigorously advocate on behalf of the Class, and counsel have ample resources to do so.

145.    **Predominance**. The common questions of law or fact identified above are substantially similar and predominate over those questions affecting only specific members of the Class.

146.    **Superiority**. This action is superior to other potential means of adjudication within the meaning of Fed. R. Civ. P. 23(b) because the prosecution of separate actions by individual Class members on these claims would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for ARC and the Vehicle Manufacturer Defendants. Adjudication for some Class members may dispose of others' interests, or impair or impede their ability to protect their interests.

147.    Absent a class action, most Class members would likely find the cost of litigating their individual claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class members' claims, only a few Class members could likely afford to seek bringing Defendants to justice or obtaining redress for the violations.

148.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to each Class member, making final injunctive or declaratory relief appropriate with respect to each Class as a whole.

149.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

150.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be substantial, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

151. The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

152. Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to optimize the efficiencies of the class mechanism and reduce management challenges. The Court may, on motion of the Plaintiff or on its own determination, certify nationwide, statewide, or multistate classes for claims sharing common legal questions, use Rule 23(c)(4) provisions to certify particular claims, issues, or common questions of fact or law for class-wide adjudication, certify and adjudicate bellwether claims, and use Rule 23(c)(5) to divide any Class into subclasses.

153. The Class expressly disclaims any recovery in this action for physical injury resulting from the Inflator Defects without waiving or dismissing such claims.

**VI.        CLAIMS FOR RELIEF**

**COUNT ONE**
**NATIONAL CLASS**
**Fraudulent Concealment**
**Against All Defendants**

154.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

155.    Plaintiff brings this claim on behalf of the other members of the National Class against all Defendants on the basis that the state laws involved do not conflict with one another in a case-dispositive manner and they involve the same key elements. Alternatively, Plaintiff brings this claim under the laws of their respective states.

156.    As Defendants concealed and suppressed material facts regarding the Defective Airbags and Class Vehicles—most importantly, the Inflator Defect and their resulting propensity to cause the inflator to rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants.

157.    Defendants took steps to ensure that their employees did not reveal known safety defects to regulators or consumers.

158.    On information and belief, Defendants still have not made full and adequate disclosure, continue to defraud Plaintiff and the Class, and continue to conceal material information regarding the Inflator Defect that exists in the Defective Airbags.

159.    Defendants had a duty to disclose the Inflator Defect because each Defendant:

i. Had exclusive and/or far superior knowledge and access to the facts than Plaintiff and the Class, and knew the facts were not known to or reasonably discoverable by Plaintiff and the Class;

ii. Intentionally concealed the foregoing from Plaintiff and the Class;

iii. Were required to accurately describe the vehicle's air bag system in an easily understandable format under 49 C.F.R. § 571.208 S4.5.1(f)(1);

iv. Were required to provide any necessary precautions regarding the proper positioning of occupants to ensure maximum safety protection of those occupants within the owner's manual under 49 C.F.R. § 571.208 S4.5.1(f)(1); and

v. Made incomplete representations about the safety and reliability of the Defective Airbags and, by extension, the Class Vehicles, while purposefully withholding material facts from Plaintiff and the Class that contradicted these representations. These incomplete representations include representations made under 49 C.F.R. § 567.4.

160. These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiff and the Class trusted Defendants not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

161.    Defendants concealed and suppressed these material facts to falsely assure purchasers and consumers that its airbags and vehicles could perform safely, as represented by Defendants and reasonably expected by consumers.

162.    Defendants concealed and suppressed these material facts to falsely assure purchasers and consumers that its airbags and vehicles could perform safely, as represented by Defendants and reasonably expected by consumers.

163.    Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

164.    Had they been aware of the Defective Airbags installed in their Class Vehicles, and Defendants' callous disregard for safety, Plaintiff and the Class either would have paid less for their Class Vehicles or would not have purchased or leased them at all. Plaintiff and the Class did not receive the benefit of their bargain because of Defendants' fraudulent concealment.

165.    Because of the concealment and/or suppression of the facts, Plaintiff and the Class sustained damage because they own vehicles that diminished in value because of Defendants' concealment of, and failure to timely disclose, the serious defects in millions of Class Vehicles and the serious safety and quality issues caused by Defendants' conduct.

166.    The value of all Class Vehicles has diminished because of Defendants' fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

167.    Accordingly, Defendants are liable to the Class for damages in an amount to be proven at trial.

168.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being, and with the aim of enriching Defendants. Defendants' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, in an amount to be proven at trial.

**COUNT TWO**
**NATIONAL CLASS**
**Breach of Implied Warranty of Merchantability**
**Against All Defendants**

169.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

170.    Plaintiff brings this claim on behalf of the other members of the National Class against all Defendants on the basis that the state laws involved do not conflict with one another in a case-dispositive manner and they involve the same key elements. Alternatively, Plaintiff brings this claim under the laws of their respective states.

171.    ARC is and was at all relevant times a merchant with respect to motor vehicle component parts, such as airbag inflators and a seller of motor vehicle component parts, such as airbag inflators.

172.    The Vehicle Manufacturer Defendants are and were at all relevant times merchants with respect to motor vehicles and sellers of motor vehicles.

173.    The Class Vehicles and component parts, such as airbag inflators, are and were at all relevant times goods.

174.    A warranty that the Class Vehicles and component parts, such as airbag inflators, with the Inflator Defect were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law.

175.    At the time of sale and all times thereafter, the Class Vehicles and component parts, such as airbag inflators, were not merchantable and not fit for the ordinary purpose for which these goods are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with Defective Airbags with the Inflator Defect that have a resulting propensity to rupture and expel metal shrapnel that poses a threat of serious injury or death to occupants.

176.    On information and belief, Defendants had notice of these issues by numerous complaints filed against them, internal investigations, and by the ongoing NHTSA Investigation into the Defective Airbags containing the Inflator Defect, or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Airbag Defect became public. Moreover, Defendants were aware of these problems long before Plaintiff and the Class and had ample notice and opportunity to correct them.

177.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and the Class have been damaged in an amount to be proven at trial.

**COUNT THREE**
**NATIONAL CLASS**
**Negligent Misrepresentation**
**Against All Defendants**

178.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

179.    Plaintiff brings this claim on behalf of the other members of the National Class against all Defendants on the basis that the state laws involved do not conflict with one another in a case-dispositive manner and they involve the same key elements. Alternatively, Plaintiff brings this claim under the laws of their respective states.

180.    Defendants owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff and Class members because Defendants knew or should have known of the Inflator Defect and the risks associated with the manifestation of the Inflator Defect. Defendants also made partial disclosures regarding the safety of the component parts of the Class Vehicles, such as airbag inflators, while Defendants either knew or should have known that these Class Vehicles possessed the Inflator Defect and failed to disclose its existence and its corresponding safety hazard.

181.    ARC was required to accurately describe the vehicle's air bag system in an easily understandable format and to disclose any necessary precautions regarding the proper positioning of occupants to ensure maximum safety protection of those occupants within the owner's manual under 49 C.F.R. § 571.208 S4.5.1(f)(1).

182.   ARC negligently misrepresented and omitted material facts concerning the standard, quality, or grade of the component parts of the Class Vehicles and the existence of the Inflator Defect exposing drivers and occupants to safety risks.

183.   The Vehicle Manufacturer Defendants negligently misrepresented and omitted material facts, in owners' manuals, maintenance schedules, the § 567.4 Placard, or elsewhere, concerning the standard, quality, or grade of the Class Vehicles and the existence of the Inflator Defect exposing drivers and occupants to safety risks. The Vehicle Manufacturer Defendants misrepresented that they would remedy any defects under the express warranties but limited their coverage to mechanical defects.

184.   As a direct result of Defendants' negligent conduct, Plaintiff and Class members have suffered actual damages.

185.   The Inflator Defect is material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. The Inflator Defect may cause the inflator to rupture and expel metal shrapnel that poses a threat of serious injury or death to occupants. No reasonable consumer expects a component part of a vehicle to contain a defect in design and manufacturing, such as the Inflator Defect, that can cause serious injury or death to consumers.

186.   Plaintiff and Class members would not have purchased the Class Vehicles but for Defendants' negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk or would have paid less for the Class Vehicles. Plaintiff and Class members justifiably relied upon Defendants' negligent false representations and omissions of material facts.

187. As a direct and proximate result of Defendants' negligent false representations and omissions of material facts regarding the standard, quality or grade of the Class Vehicles with the Inflator Defect, Plaintiff and Class members have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## COUNT FOUR
## NATIONAL CLASS
## Unjust Enrichment
## Against All Defendants

188. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

189. Plaintiff brings this claim on behalf of the other members of the National Class against all Defendants on the basis that the state laws involved do not conflict with one another in a case-dispositive manner and they involve the same key elements. Alternatively, Plaintiff brings this claim under the laws of their respective states.

190. Defendants have received and retained a benefit from Plaintiff and inequity has resulted.

191. Defendants benefitted from selling Defective Airbags and Class Vehicles for more than they were worth, at a profit, and Plaintiff and the Class overpaid for the Class Vehicles as a result and have been forced to pay other costs.

192. It is inequitable for Defendants to retain these benefits.

193. As a result of Defendants' conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

**COUNT FIVE**
**NATIONAL CLASS**
**Violation of the Magnuson-Moss Warranty Act**
**Against the Vehicle Manufacturer Defendants**

194.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

195.    Plaintiff brings this claim for violation of the Magnusson-Moss Warranty Act (15 U.S.C. § 2301, et seq.) on behalf of the National Class against the Vehicle Manufacturer Defendants.

196.    Plaintiff and the Class are "consumers" under 15 U.S.C. § 2301(3).

197.    Defendants are "suppliers" and "warrantors" under 15 U.S.C. § 2301(4) and (5).

198.    The Class Vehicles are "consumer products" under 15 U.S.C. § 2301(6).

199.    Defendants provided an implied warranty of merchantability as part of its business of supplying and profiting from the sale of the Class Vehicles and the Defective Inflators. This warranty of merchantability includes that the Class Vehicles' airbag inflators were fit for their ordinary purpose (i.e., that they would safely deploy rather than shooting metal shrapnel at the drivers and passengers), would pass without objection in the trade as designed, manufactured, and marketed, and were adequately and properly contained, packaged, and labeled.

200.    Defendants breached their warranty for the Class Vehicles' inflators because:

i. The airbag inflators have latent defects which cause them to have a dangerous propensity to rupture and eject metal shrapnel, thereby subjecting Plaintiff and the class to the risk of loss and injury;

ii. Defendants denied and concealed the existence of the Inflator Defect, in the process refusing to pay for needed repairs and replacements for Plaintiff and the Class; and

iii. Defendants failed to provide the needed repair or replacement for the fundamental design defect impacting the Class Vehicles.

201. Plaintiff and the Class sustained damages and other losses due to Defendants' breach of their warranties. Plaintiff and the Class will suffer irreparable harm if Defendants are not ordered to properly repair all the Class Vehicles and Defective Inflators immediately, offer rescission by repurchasing their defective Class Vehicles for their full cost, and reimburse the owners and lessees of the Class Vehicles for the monies they have paid to own and lease the vehicles.

202. Resorting to any informal dispute resolution procedure or affording Defendants a reasonable opportunity to cure its warranty breaches to Plaintiff and the Class is unnecessary and futile. At the time they sold or leased the Class Vehicles, Defendants knew, should have known, or were reckless in not knowing of their misrepresentations or omissions concerning the Inflator Defect, but nevertheless failed to rectify the situation or disclose it to Plaintiff or the Class.

203. Moreover, the remedies available through any informal dispute resolution procedure would be wholly inadequate under the circumstances. Accordingly, any

statutory requirement that Plaintiff resort to an informal dispute resolution procedure or afford Defendants a reasonable opportunity to cure its breach of written warranties is excused and, thereby, deemed satisfied.

204.    Plaintiff, individually and on behalf of the Class, seeks all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs and any other applicable relief sought in the Prayer for Relief below.

**COUNT SIX**
**IOWA SUBCLASS**
**Violations of Iowa Private Claim For Consumer Frauds Act**
**(Iowa Code § 714H)**
**Against All Defendants**

205.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

206.    Plaintiff brings this claim individually and on behalf of the other members of the Iowa Subclass.

207.    The Iowa "Private Right of Action for Consumer Frauds Act" prohibits unfair and deceptive trade practices in the sale, lease, or advertisement of a product or service, and in the solicitation of charitable contributions. The Act's purpose is to protect consumers against these unfair and deceptive business practices, and to provide efficient and economical procedures to secure such protection.

208.    Plaintiff's right as a consumer to bring this action at law derives from the Iowa "Private Right of Action for Consumer Frauds Act," 714H. The Iowa legislature enacted the Iowa "Private Right of Action for Consumer Frauds Act" to allow Iowa

consumers who have been victimized by an unfair or deceptive trade business practice to obtain damages and other such equitable relief as the Court deems necessary to protect the public from further violations.

209.   Specifically, Plaintiff alleges that Defendants have violated the Iowa "Private Right of Action for Consumer Frauds Act" by engaging in the unfair and/or deceptive acts and practices set forth within the Act. Defendants concealed and suppressed material facts regarding the Defective Airbags and Class Vehicles—most importantly, the Inflator Defect and their resulting propensity to cause the inflator to rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants. Defendants' unfair and deceptive business practices were and are intended to and did and do result in the purchase of Defendants' products by consumers, including Plaintiff, in violation of the Iowa "Private Right of Action for Consumer Frauds Act."

210.   As a result of Defendants' unfair and/or deceptive business practices, Plaintiff and the Class have in that they paid for products that did not have the benefit as represented. Plaintiff seeks and is entitled to actual damages, an order enjoining Defendants from continuing to engage in the unfair and deceptive business practices alleged herein, and all costs and reasonable attorney fees.

211.   The Iowa "Private Right of Action for Consumer Frauds Act" authorizes, in addition to actual damages, statutory damages up to three times the amount of actual damages if a Defendant's practice constitutes willful and wanton disregard for the rights or safety of another. Defendants concealed and suppressed material facts about a safety risk that places the driver and occupants of Class Vehicles at risk of serious injury or death.

On information and belief, Defendants had notice of these issues by numerous complaints filed against them, internal investigations, and by the ongoing NHTSA Investigation into the Defective Airbags containing the Inflator Defect. This shows willful and wanton disregard for the rights and safety of Plaintiff and the Class, and entitles them to statutory damages, in an amount to be proved at trial.

212.   Plaintiff and her counsel have sought and have obtained the approval to bring this claim pursuant to §714H.7.

## VII.   PRAYER FOR RELIEF

Plaintiff requests that judgment be entered against Defendants as follows:

A.   That this action be certified as a class action;

B.   That Plaintiff be appointed as the representative of the Class;

C.   That Plaintiff's attorneys be appointed as Class Counsel;

D.   For an order declaring Defendants' conduct unlawful;

E.   For an order for Defendants to make restitution to Plaintiff and the Class in an amount to be proven at trial;

F.   For actual damages;

G.   For statutory or other liquidated damages, as applicable;

H.   For pre and post-judgment interest at the legal rate to the extent available;

I.   For injunctive and other equitable relief as appropriate;

J.   For attorney's fees, costs of this action, and out-of-pocket costs; and,

K.   For such other and further relief that the Court deems proper.

Dated: November 29, 2022

SHINDLER, ANDERSON, GOPLERUD &
WEESE, P.C.


/s/ J. Barton Goplerud

J. Barton Goplerud, AT0002983
Brian Marty, AT0011622
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265-5749
Telephone:    (515) 223-4567
Facsimile:    (515) 223-8887
Email:        goplerud@sagwlaw.com
              marty@sagwlaw.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
ROBERT K. SHELQUIST
REBECCA A. PETERSON
CRAIG S. DAVIS
MEGAN S. VAN DYKE
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rkshelquist@locklaw.com
        rapeterson@locklaw.com
        csdavis@locklaw.com
        msvandyke@locklaw.com

**Counsel for Plaintiffs**